### MARYLAND DRYDOCK CO. v. THE SAN FRANCISCO.

### REPUBLIC S.S. CORP. v. MARYLAND DRYDOCK CO.

#### No. 3105.

United States District Court.
D. Maryland.

Aug. 12, 1949.

David R. Owen and E. F. A. Morgan, Semmes, Bowen & Semmes, of Baltimore, Md., for Maryland Drydock Co.

Southgate L. Morison, Ober, Williams, Grimes & Stinson, of Baltimore, Md., for Republic S. S. Corp., owner of vessel.

L. Vernon Miller, Franklin G. Allen, Marbury, Miller & Evans, of Baltimore, Md., and Francis M. Shea, Shea, Greenman, Gardner & McConnaughey, of Washington, D. C., for Internal Refugee Organization, intervening libellant.

COLEMAN, Chief Judge.

This is an in rem libel suit brought by the Maryland Drydock Company, a Maryland corporation, against the Panamanian steamship San Francisco, a vessel of some 8000 gross tons, to recover for the work and labor involved in repairing and converting this vessel at libellant's plant in Baltimore from a cargo to an emigrant carrier.

There is a cross libel by the vessel's owner, The Republic Steamship Corporation, a corporation organized under the laws of the Republic of Panama, for damages for alleged failure on libellant's part to conform to the agreement to repair and convert the vessel.

There is an intervening libel by The International Refugee Organization, a specialized agency of the United Nations, having its principal offices in Geneva, Switzerland. This organization had chartered the vessel from its owner for the carriage of emigrants, and pursuant to this charter, advanced to the owner the sum of $840,000 to be used, as alleged by the International Refugee Organization, for the purposes of repairing, converting and refitting the vessel as an emigrant carrier; for the purchase of daily provisions, sea stocks, deck and engine supplies, etc., and for expenses in assembling a crew and paying their wages until the vessel should commence operations under the charter. International Refugee Organization, in its intervening libel, asserts that the Republic Steamship Corporation has breached the charter by failure to deliver the vessel as agreed, and the intervening libellant claims that thereby it is relieved from any further obligation to perform its part of the charter, and demands the return of the advance of $840,000 and a further sum of $340,000 as liquidated damages for breach of the charter, or a total of $1,180,000, for $300,000 of which a lien is claimed upon the vessel for reasons hereinafter specifically stated.

There are various other intervening libels but they have been separately heard and adjudicated.

The libellant—hereinafter referred to as "Maryland"—claims a lien of approximately $798,000. The contract price for repairs and conversion of the vessel was $585,000, including the so-called special item of $35,000, leaving $213,000 for work alleged to have been done, over and above the contract price.

■ We find that the weight of the credible evidence fully sustains Maryland in its contention and that therefore it is entitled to a lien for the total amount of its claim. The contract between Maryland and the Republic Steamship Corporation—hereinafter referred to as "Republic"—unfortunately is not one that enables us to determine, from any particular single phrase or clause in the letters, following telephone correspondence, that constitute the contract, just what was intended to be included in the flat contract price of $550,000 plus the additional items limited to $35,000 already referred to. That has necessitated determining, from the weight of the credible evidence, to what extent, if any, the parties agreed that there would be additional liability on the part of Republic over and above the flat contract price.

After carefully weighing all of the evidence, both testimony of the witnesses heard and the exhibits in connection therewith, and the deposition testimony, we reach the conclusion that the testimony of Mr. McKenna, the representative of Maryland on the job, is more truly expressive of what actually was agreed upon by the parties, than the testimony adduced on behalf of Republic, especially the testimony of Messrs. Roberts and Bagger.

When parties, as happened in this case, are willing to hazard disputes over their contractual relations through failure to properly set down their intentions in writing, with the aid of counsel, it often becomes very difficult to determine just what was in fact intended by the parties. Shorn of technicalities, the position of International Refugee Organization—hereinafter referred to as IRO—in introducing testimony with respect to Republic's position in this case, and assuming, as it has done, the burden of contesting Maryland's lien claim, is, as the Court understands it, that by the agreement between Maryland and Republic, The San Francisco was to be completely reconditioned for the flat sum of $585,000 so as to meet the requirements of Lloyds Classification, U. S. Coast Guard, and International Safety at Sea requirements, as set forth in the letter dated July 30, 1948, from the General Engineering and Dry Dock Corporation—hereinafter referred to as "General Engineering"—the authorized agent for Republic, addressed to Mr. Jory, assistant to the President of Maryland and in Mr. Jory's letter to General Engineering dated August 3, 1948, subject only to the additional cost of the work on the vessel's machinery. That is prima facie a plausible position if we isolate the testimony advanced in support of it, particularly by Mr. Roberts of Lloyds, and by Mr. Bagger, the naval ex-

pert, and consider nothing else but the letters just referred to and the preceding oral correspondence between Maryland and General Engineering. But the Court believes, after weighing the entire testimony, that what actually happened was that, as a result of the rather meager drawings and specifications which were mutually accepted and formed the basis of the work, almost immediately after commencement of the reconversion work by Maryland, it developed that a great many items were not covered by the drawings and specifications which Mr. Shaw, General Engineering's representative on the job, actually wanted, asked for, and approved.

Mr. McKenna, Maryland representative on the job, testified emphatically that Mr. Shaw approved all items which make up the so-called additional invoices forming part of the extra portion of Maryland's claim, exclusive of those items as to which there was an agreement that the reasonableness of Maryland's charges for same and the need for the work covered thereby would not be disputed, reserving however, for later determination, the question as to which party should bear the cost of same. The Court believes Mr. McKenna's testimony is more reliable than any other testimony in the case.

Without going into the details of the many and varied items, suffice it to say that the construction which the Court concludes must be placed upon the dealings which the parties had with each other is contrary to that which IRO would have us place upon them, and is simply this: the two parties, Maryland and Republic acting through General Engineering, were both avid to have the job, which was a big one, done just as quickly as possible. It was full of intricate details, which is usually true in all construction or conversion work on large vessels. Unfortunately, the parties apparently did not deem it necessary to resort to the services of attorneys, but went ahead, through oral conversations and the aid of the letters referred to, to have the work done. The result is a common one where parties fail to set down in writing common grounds for dispute which they foresee, or should foresee, would arise and therefore should be covered by specific agreement.

Republic gave plans—guidance plans, to be sure, as they were called—and asked for specifications, which Maryland supplied, and the work was begun on that basis. The weight of the credible evidence clearly requires a ruling that none of the disputed items falls within any express or implied provision of the specifications. Prima facie, it is possible, by implication, to bring many of those items within the specifications. They can be shown, as Messrs. Roberts and Bagger have shown, to be the sort of thing that Lloyds require in one form or another; but that does not warrant saying that, because of the provision contained in the meager letter correspondence between the parties, that Lloyds' Classification, U. S. Coast Guard, and International Safety at Sea requirements shall be met, therefore anything that related in any sense to meeting those requirements was something embraced within the flat contract price. The parties had expressed a willingness to proceed, and did proceed, upon the basis of certain specifications, and then, as is found from the weight of the credible evidence, they agreed from time to time upon innumerable items which it is impossible to conclude read upon the specifications. In short, we are unwilling to read into the relations between these parties something that never actually existed merely because large sums are involved, or because it would be difficult, if not impossible, to obtain a satisfactory adjudication of their differences in a forum other than the admiralty court, through this in rem proceeding.

It is obvious that IRO was so avid to secure this vessel that it was willing to by-pass the precautions which good business judgment dictated should have been taken. To be sure, Maryland was also lacking in proper precautions in dealing with Republic, and its agents generally. But Maryland was honest in its dealings and has established its right to a lien for the work and material expended as claimed. There is no convincing evidence that Maryland overcharged. Its testimony remains unrefuted

that it lost a large sum on this project. However, the Court has not been and must not be influenced by this fact, but solely by the weight of what it believes to be the most credible evidence as to what really was the intention of the parties, as nearly as that intention can be ascertained from their conduct, more particularly their conduct at the time the work was performed upon the vessel rather than at the time it was originally contracted for, because of the ambiguities involved in the original agreement.

■■ Next we turn to the claim of Republic that it is entitled to a set-off against anything allowed Maryland under its lien, on account of Maryland's delay in delivering the vessel. As to this argument, suffice it to say that we find no merit in it for the following reasons: (1) proof is lacking that Maryland was in fact responsible for the delay. The delivery date in the contract was October 12, 1948, but that was extended by mutual agreement to October 22d. On October 30th Republic was notified by Maryland that the vessel was ready for delivery. So, in any event, the delay was not excessive. (2) Since it was then clear that Republic was not financially able to make even a part payment, on account, of what might be due Maryland, the latter should not be held to blame for not releasing the vessel, because to have done so, without indemnity, would have meant completely surrendering its lien claim.

We turn next to the two liens claimed by IRO, (1) a maritime and (2) an equitable lien The maritime lien is asserted to be on a parity with that of Maryland, for approximately $300,000, on the ground that for this amount IRO is entitled to be subrogated to the rights of those who furnished supplies to the vessel. The basis for this argument is that the $840,000 which IRO advanced to Republic was for a specific purpose, namely, for the conversion or reconditioning of the vessel in connection with the charter; whereas, due to misrepresentation on the part of Republic as to the ownership and condition of the vessel, IRO was misled into advancing these funds and that, therefore, IRO should be allowed to trace into the vessel, so to speak, and to have a lien on the vessel for, so much of those funds as

represents amounts actually invested in supplies for the vessel.

Secondly, IRO claims an equitable lien for the balance of its advance of $840,000, namely, roughly, $500,000, on the same ground as above stated, that is, one of misrepresentation and fraud.

■ First, as to the alleged maritime lien claimed by IRO, there is no reference whatsoever in the charter to any lien created on the vessel, and nothing to show that such reference was inadvertently left out. On the contrary, Madeiros, the owner, testified that there was never any intention to give IRO a lien; that IRO expected to get its money back through the charter hire as stipulated in the charter. Further, the charter says nothing about the use to which the money advanced by IRO should be put. In other words, there was no limitation placed upon its use. The Court has given full consideration to the deposition testimony to the effect that there was a very definite restriction upon its use; and that there was an understanding that the restrictions existed. But the Court is not convinced by that testimony, and feels that a good deal of it has been inspired by after events.

■ Lastly, we feel, apart from all else, that the fact that the advance was made by IRO before any supplies had been furnished the vessel or contracted for, in and of itself refutes any right of IRO to claim this lien. There can be no tracing of any specific funds into the purchasing of supplies for the vessel.

■ In reaching this conclusion we have duly considered Section 973 of Title 46 U.S.C.A. which imposes upon one advancing money on the credit of a vessel the duty to inquire as to the vessel's status, and whether those ordering repairs, etc., had authority to bind the vessel therefor. Even if we assume that Maryland was under an obligation in the present case to have inquired into the precise relationship between Republic, General Engineering and IRO, there was no obligation to go beyond asking to be shown the agreement under which Republic had acquired, or was to acquire the vessel, and the charter party itself. If Maryland had made such an inquiry and

had these agreements been disclosed at the time in question, they would not have indicated any restriction upon Maryland's right to a lien.

What has just been said with respect to the absence of any maritime lien applies with even greater force to IRO's claim to an equitable lien.

It thus becomes unnecessary to go into the question as to when a charterer, or some one on his behalf, may obtain a lien on the vessel chartered. We have been shown no case, nor are we aware of any, where a lien, either maritime or equitable, has been accorded under circumstances such as existed in the present case.

A decree will be signed in accordance with this opinion.